UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GREATER YELLOWSTONE COALITION,<br>           Plaintiff,<br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY,<br>           Defendant,<br>and<br><br>IDAHO DEPARTMENT OF ENVIRONMENTAL QUALITY and IDAHO ASSOCIATION OF COMMERCE AND INDUSTRY,<br><br>           Defendant-Intervenors. | Case No. 4:12-CV-60-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment, and a motion by the Environmental Protection Agency (EPA) to remand one issue to the agency. The Court heard oral argument on April 4, 2013, and took the motions under advisement. For the reasons explained below, the Court will (1) grant the motion to remand a portion of this case; (2) deny the motion for summary judgment filed by plaintiff Greater Yellowstone Coalition (GYC) on the issue of Idaho's definition of "degradation," and (3) grant the cross-motions for summary judgment filed by the EPA and intervenors.

## LITIGATION BACKGROUND

GYC challenges the EPA's approval of Idaho's rules governing water quality in

the State. Specifically, GYC challenges the EPA's approval of (1) Idaho's definition of "degradation" of water quality, and (2) Idaho's mandatory exemption from review for *de minimis* levels of discharge. GYC seeks a summary judgment that both approvals should be overturned.

The EPA defends its approval of the "degradation" definition, but asks for an opportunity to reconsider its approval of the *de minimis* exemption. The parties are all in agreement that the Court should remand the *de minimis* issue to the EPA although they differ on the conditions of that remand. The Court will resolve these issues after reviewing the background of this litigation.

The EPA's approval of Idaho's rules is governed by the Clean Water Act (CWA). Its objective is "to restore and maintain the chemical, physical, and biological integrity of the nation's waters." *See* 33 U.S.C. § 1251. The CWA requires the states to set water quality standards for all waters within their boundaries, *see* 33 U.S.C. § 1313, and the EPA's regulations describe the process for setting those standards. *See* 40 C.F.R. § 131.6. The state must first identify designated uses for the water in order to establish goals for water quality. The state then develops water quality criteria to achieve those goals and establishes an antidegradation policy to ensure public input and maintain the water quality. The EPA described that process in a nutshell: "Designated uses establish the water quality goals for the water body, water quality criteria define the minimum conditions necessary to achieve the goals and an antidegradation policy specifies the framework to be used in making decisions regarding changes in water quality." 63

**Memorandum Decision & Order – page 2**

Fed.Reg. 36742 at 36779-80 (July 7, 1998).

It is this last step – the state's establishment of an antidegradation policy – that is challenged by the GYC here:  The degradation definition and the *de minimis* exemption are both part of Idaho's antidegradation policy.  A state's antidegradation policy is triggered when an activity is proposed for a body of water that may have some effect on water quality.  The EPA requires that a state's antidegradation policy offer three levels of protections to water bodies depending largely on the existing water quality in that particular water body.  The highest level of protection – tier III – is reserved for waters of "exceptional" significance, such as those found in National Parks and wildlife refuges.  *See* 40 C.F.R. § 131.12(a)(3).  The minimum level of protection – tier I – is granted to all water bodies and maintains all existing uses and the water quality to protect those uses.  *Id*. at § 131.12(a)(1).

It is the middle level of protection – tier II – that is at issue here.  It applies when "the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water." 40 C.F.R. § 131.12(a)(2).  The capacity of a water body to absorb pollution from a new use and yet still maintain the water quality necessary to support fish, wildlife, and recreation is known as its "assimilative capacity."  *Kentucky Waterways Alliance v.* Johnson, 540 F.3d 466, 471 n. 4 (6th Cir. 2008).  Tier II water bodies have an assimilative capacity.  Under the EPA's regulations, a pollution increase that would decrease a water body's assimilative capacity would need to be justified by the necessity of the pollution for achieving important

**Memorandum Decision & Order – page 3**

economic and social development.  *Id., see* 40 C.F.R. § 131.12(a)(2).  However, the regulation prohibits any pollution increase that would create negative assimilative capacity, regardless of the economic or social necessity for the pollution.  *Id.*

Once a State adopts or revises its water quality standards, including its antidegradation policy, the CWA requires the State to submit these standards to the EPA for review.  *See* 33 U.S.C. § 1313(c)(1).  If the State's standards are consistent with the CWA and the EPA's implementing regulations, then the EPA must approve the state standards within sixty days.  *See* 33 U.S.C. § 1313(c)(3).  However, if the state water quality standards do not satisfy the CWA's requirements, the EPA must, within ninety days, "notify the State and specify the changes to meet such requirements.  If such changes are not adopted by the State within ninety days after the date of notification, the [EPA] shall promulgate such standard[s]."  *Id.*

**Idaho's *de minimis* Exemption**

As part of its CWA plan, Idaho enacted an automatic exemption from Tier II antidegradation review if the additional pollution from a new activity would consume only 10% or less of the "assimilative capacity" of a water body.  *See* Idaho Code § 39-3603(2)(c)(I).  This exemption has been referred to as the *de minimis* exemption.  GYC argues that it allows too much pollution.  For example, consider a toxin that accumulates in the water without breaking down.  In small amounts it may be harmless, but each small discharge that evades review under the *de minimis* exemption adds an accumulating load of toxins to the water that at some point will harm water quality.  GYC is concerned that

**Memorandum Decision & Order – page 4**

the EPA did not fully consider this point.

After reviewing GYC's challenge, the EPA filed a motion to remand this issue to the agency for further consideration.  The other parties agree to the remand but seek to impose various conditions on the remand.  At oral argument, the parties agreed that the time limit for the remand be 90 days.

This Court has the inherent authority to remand this case to the EPA.  *Loma Linda University v. Schweiker*, 705 F.2d 1123 (9th Cir. 1983).  While GYC wants the Court to bar the EPA from considering any new rationales for supporting the *de minimis* exception on remand, the agency has full authority to reconsider – "the power to decide in the first instance carries with it the power to reconsider."  *See NRDC, Inc. v. U.S.*, 275 F.Supp.2d 1136, 1141 (C.D.Cal. 2002).  Moreover, the Court will adopt the suggestion of intervenor IACI and retain jurisdiction over the case so that GYC can challenge in this Court any new analysis of the EPA.  But IACI's request that the Court order the EPA to "actively include" IACI in the remand process would unduly hamper the EPA's discretion on remand.

In conclusion, the Court will grant the EPA's motion for remand and give it 90 days to either: (1) take a new action on the *de minimis* provision; or (2) inform the Court that it has determined not to take a new action, and to file a cross-motion for summary judgment and brief in support of that motion regarding the *de minimis* provision.  The Court will maintain jurisdiction to ensure a timely remand process and to allow the parties to challenge any new EPA decision in this case.

**Memorandum Decision & Order – page 5**

**Idaho's Antidegradation Definition**

GYC challenges the EPA's approval of Idaho's definition of degradation. The term is significant because Idaho requires Tier 2 review when an activity or discharge would "cause degradation." IDAPA 58.01.02.052.08. The challenged definition is contained in Idaho Code § 39-3602(6), which states as follows:

> "Degradation" or "lower water quality" means, for purposes of antidegradation review, a change in a pollutant that is adverse to designated or existing uses, as calculated for a new point source, and based upon monitoring or calculated information for an existing point source increasing its discharge. Such degradation shall be calculated or measured after appropriate mixing of the discharge and receiving water body.

This provision begins by using the terms "degradation" and "lower water quality" interchangeably, suggesting that they mean the same thing. That is precisely the meaning the law requires. The parties all agree that degradation must be defined as a lowering of water quality to comply with the CWA.

If this provision had ended there – by equating "degradation" with "lower water quality" – it would have been unassailable under the CWA. But the definition does not end there, and the added language gives rise to GYC's challenge. More specifically, the drafter added language that defines both "degradation" and "lower water quality" as "a change in a pollutant that is adverse to designated or existing uses."

When the EPA first saw that language during the drafting stage, it was concerned that degradation was being defined as being adverse to uses rather than to water quality, a result that violated the CWA. The EPA urged Idaho to change the language and

**Memorandum Decision & Order – page 6**

suggested alternatives that would clearly tie degradation to "worsening water quality." *See AR* at 951-52. The EPA explained to Idaho that "it is important that the definition of degradation does not imply that uses must be adversely affected before a proposed change in water quality triggers an anti degradation review." *Id.* at 1255. Even though the EPA made three specific requests for Idaho to change its language, Idaho did not make those changes.

The IDEQ did, however, respond to the EPA in a filing entitled "Response to Public Comments." Specifically, the IDEQ was responding to the EPA's comment that "[i]t is important that a proposed lowering of water quality need not be of a degree that would impair uses to be given appropriate consideration under IDEQ's antidegradation policy and implementation procedures." *See* AR Doc. 18 Att. 4 at 001044. The IDEQ responded to that as follows:

> [I]DEQ believes this suggested change is unnecessary. [I]DEQ agrees completely that "lowering of water quality" need not be of a degree that would violate criteria in order to be given appropriate consideration under [I]DEQ's antidegradation policy. Such an interpretation would completely obfuscate Tier II and Tier III protection.

*Id.* The EPA seized on this clarification in approving Idaho's antidegradation rule, finding that

> Idaho has clarified that "adverse to designated or existing uses" means that the change in pollutant would result in a reduction in water quality. The reduction in water quality need not be of such magnitude that it would impair uses in order for that reduction to be given appropriate consideration under IDEQ's antidegradation policy and implementation procedures.

*See* AR Doc. 1 at 000008.

**Memorandum Decision & Order – page 7**

The EPA may "clarify ambiguous state regulations by consulting with the state and relying on authorized state interpretations." *Kentucky Waterways*, 540 F.3d at 493. But where the state rule is not ambiguous, "securing an informal commitment from a state agency rather than requiring the state to amend its regulations violates the federal approval procedure established by 33 U.S.C. § 1313(c)(3) . . . ." *Id.* at 494. The EPA may not effectively rewrite or amend existing state regulations, *see, e.g., Riverside Cement Co. v. Thomas*, 843 F.2d 1246, 1248 (9th Cir.1988), nor may it "escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation." *Defenders of Wildlife v. E.P.A.*, 415 F.3d 1121, 1127 (10th Cir. 2005) (quoting *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1024 (D.C.Cir.2000)).

Two bookend cases that describe when the EPA can rely on a state's clarifications are *Kentucky Waterways* and *Defenders of Wildlife.* In the former, the EPA's reliance was misplaced while in the latter it was proper. The difference hinged entirely on the ambiguity – or lack thereof – in the state's CWA rules.

In *Kentucky Waterways,* Kentucky's antidegradation plan for coal-mining discharge failed to pass muster under EPA regulations. Kentucky gave the EPA an informal commitment that would correct the flaw, and the EPA approved the plan. The Sixth Circuit reversed, holding that Kentucky's informal commitment was contrary to the unambiguous plan it had submitted, and that the EPA had no authority to approve a plan under those circumstances.

In *Defenders of Wildlife*, the plaintiffs claimed that New Mexico's rules violated the CWA by precluding the taking of certain measurements and the setting of certain standards required by the CWA. The Tenth Circuit disagreed, finding that the New Mexico rules – when read as a whole – were ambiguous, and that the EPA properly relied on New Mexico's clarification in approving the rules. *Id*. at 1127-28.

While these two cases are not binding on this Court, they are certainly persuasive. The Court will follow their analysis here. The authority of the EPA to rely on Idaho's

**Memorandum Decision & Order – page 8**

clarification of its CWA rules depends on whether those rules – read as a whole – are ambiguous.

In this case, there is no ambiguity in the definition of "degradation" quoted earlier – it means a change adverse to use, not a change adverse to water quality. But other provisions of Idaho's rules do tie degradation to a change in water quality. Idaho's antidegradation policy contained in IDAPA 58.01.02.052.08 states that the IDEQ "will evaluate the effect on water quality for each pollutant. The [IDEQ] will determine whether an activity or discharge results in an improvement, no change, or degradation of water quality."

The Rule then goes on to explain that for each new activity or discharge, the IDEQ will be measuring not the effect on use but the change in water quality resulting from the new activity or discharge:

> For a reissued permit or license, the calculated change will be the difference in water quality that would result from the activity or discharge as authorized in the current permit or license and the water quality that would result from the activity or discharge as proposed in the reissued permit or license. For a new permit or license, the calculated change will be the difference between the existing receiving water quality and water quality that would result from the activity or discharge as proposed in the new permit or license.

*See* IDAPA 58.01.02.052.06(a). Using this measurement, the IDEQ will determine whether the new activity or discharge "results in an improvement, no change, or degradation of water quality." *Id.* at 052.06. In this context – where the three choices are "improvement, no change or degradation of water quality" – the term "degradation" means "adverse" to water quality. And the provision makes it clear that "degradation" is being measured exclusively by the change in water quality; it says nothing about measuring changes or effects on uses.

This provision raises an ambiguity in the Idaho rules when read as a whole. While

**Memorandum Decision & Order – page 9**

"degradation" is defined as a change adverse to uses in one provision, it is measured as a change adverse to water quality in another.  Given that ambiguity, the EPA had the authority, under the analysis of *Defenders of Wildlife*, to call on Idaho for clarification.  Idaho gave that clarification, representing to the EPA and to this Court that degradation means a change in a pollutant that reduces water quality.  That clarification aligns Idaho's rules with the CWA and renders the EPA's approval proper.

Accordingly, the Court will deny GYC's motion for summary judgment and grant the motions filed by the EPA, the IDEQ, and the IACI.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that GYC's motion for summary judgment (docket no. 41) is DENIED.

IT IS FURTHER ORDERED, that the motions for summary judgment filed by the EPA, the IDEQ, and the IACI (docket nos. 46, 54 & 58) are GRANTED.

IT IS FURTHER ORDERED, that the motion for voluntary remand (docket no. 45) is GRANTED.  The Court will remand the *de minimis* exemption issue to the EPA with directions that it have 90 days to either: (1) take a new action on the *de minimis* provision; or (2) inform the Court that it has determined not to take a new action, and to file a cross-motion for summary judgment and brief in support of that motion regarding the *de minimis* provision.  The Court will retain jurisdiction to ensure a timely remand process and to allow the parties to challenge any new EPA decision in this case.

**Memorandum Decision & Order – page 10**



DATED:  **April 24, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 11**